UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
GREGORY L. HUDSON,                                          :
                                                            :
                              Plaintiff,                    :
                                                            :          04 Civ. 6997 (GEL)
             -v-                                            :
                                                            :          **OPINION AND ORDER**
UNIVERSAL STUDIOS, INC., et al.,                            :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------x

Gregory L. Hudson, pro se.

Richard Dannay and Thomas Kjellberg,
Cowan, Liebowitz & Latman, P.C.,
New York, NY, for defendants.

GERARD E. LYNCH, District Judge:

  Plaintiff, appearing pro se, brought this action for copyright infringement under the Federal Copyright Act, 17 U.S.C. § 101 et seq., breach of implied contract under New York law, and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleging that Universal Studios, Inc., Universal Pictures, Inc., and Imagine Films Entertainment, LLC, used, without permission or compensation, his original plays *Bronx House* and *No Harm, No Foul* in creating the motion picture *Life*.  This Court initially dismissed Hudson's complaint in its entirety, finding the claims barred by res judicata. Hudson v. Universal Studios, Inc., No. 04 Civ. 6997 ("Hudson III"), 2006 WL 1148695, at *1 (S.D.N.Y. Apr. 28, 2006).  The Court of Appeals affirmed the dismissal of Hudson's claims related to *No Harm, No Foul*, but vacated and remanded his claims related to *Bronx House* for further proceedings. Hudson v. Universal Studios, Inc. ("Hudson IV"), 235 F. App'x 788, 790 (2d Cir. 2007).  Defendants now move for

summary judgment on Hudson's *Bronx House* claims on the grounds that (1) there is no substantial similarity between *Bronx House* and *Life*; (2) plaintiff cannot establish the existence of a valid contract or a breach of the contract alleged; and (3) the Lanham Act cannot support plaintiff's claim of unfair competition. Defendants' motion for summary judgment will be granted.

## BACKGROUND

Plaintiff Gregory Hudson is the author of the play *Bronx House*. (Pl.'s Statement Pursuant to Local Civil Rule 56.1 ¶ 1.) Hudson claims to have delivered a copy of his *Bronx House* script to defendants during the spring of 1996. (Id. ¶ 5.) In 2002, believing that the motion picture *Life,* distributed by Imagine Films and Universal Studios, infringed upon his copyrighted work *No Harm, No Foul*, Hudson sued defendants and others in the Eastern District of New York. Hudson v. Seagrams, Inc., No. 02-CV-2571 ("Hudson I"). Hudson I was dismissed on the consent of both parties because Hudson had failed to register his copyright for *No Harm, No Foul*.[1] In 2003, after registering his *No Harm, No Foul* copyright, Hudson again sued defendants and others. See Hudson v. Universal Pictures Corp., No. 03-CV-1008 ("Hudson II"), 2004 WL 1205762, at *1 (E.D.N.Y. Apr. 29, 2004). Although Hudson's complaint in Hudson II alleged only that *Life* was copied from *No Harm, No Foul*, in the course of the proceedings, Hudson argued and introduced evidence that *Life* was also copied from *Bronx House*. Id. at *4. The Hudson II court ruled that "no reasonable jury could find a substantial similarity between the protected elements of *No Harm, No Foul* and *Life*," and that the claim of

---

[1] Under 17 U.S.C. § 411(a), "no action for infringement" can be instituted "until preregistration or registration of the copyright claim has been made in accordance with [copyright law]."

2

similarity between *Bronx House* and *Life* was similarly "meritless." Id. The court granted defendants' motion for summary judgment and dismissed the complaint. Id. at *5. The court's judgment was affirmed by summary order in Hudson v. Imagine Entertainment Corp., 128 F. App'x 178, 179 (2d Cir. 2005).

After his complaint was dismissed in the Eastern District, Hudson brought suit in this district, again alleging that *Life* infringed both *Bronx House* and *No Harm, No Foul*. This Court, adopting the Report and Recommendation of Magistrate Judge Theodore H. Katz, found Hudson's claims barred by Hudson II. Hudson III, 2006 WL 1148695, at *1. The Court of Appeals affirmed the dismissal of claims stemming from *No Harm, No Foul*. Hudson IV, 235 F. App'x at 790. However, mindful of plaintiff's status as a "pro se litigant" and the somewhat "muddled circumstances" under which Hudson's *Bronx House* claims were adjudicated in Hudson II, the Second Circuit remanded plaintiff's *Bronx House* claims to this Court for further proceedings. Id.

Defendants now move for summary judgment on the merits of Hudson's *Bronx House* claims.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must "draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary

3

judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). The initial burden rests on the movant to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This shifts the burden to the non-moving party who must "by affidavits or as otherwise provided . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Additionally, the non-moving party must "come forward with enough evidence to support a jury verdict in its favor." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

## II.     Copyright Infringement

### A.     Legal Standard

Establishing a claim of copyright infringement requires that the plaintiff show (1) "ownership of a valid copyright," (2) copying of the copyrighted work, and (3) that the copying amounts to an "unlawful appropriation." Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir. 1992), citing Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946). For purposes of this motion, defendants contest neither the first nor the second element. (D. Mem. 19.) Instead, they claim to be entitled to summary judgment because no unlawful appropriation occurred. (Id.)

Copying amounts to "unlawful appropriation" when "substantial similarity" exists between two works. Laureyssens, 964 F.2d at 140. Generally, summary judgment on issues of substantial similarity is "frowned upon." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980). Nevertheless, summary judgment is appropriate "when all alleged similarity" is related only to "non-copyrightable elements of the plaintiff's work." Id. Non-copyrightable elements include "facts [and] ideas," as distinguished from the particular expression of such facts and ideas. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S.

4

539, 547 (1985). "The distinction between an idea and its expression is an elusive one." Williams v. Crichton, 84 F.3d 581, 587-88 (2d Cir. 1996). But the nub is that an author must use creativity to transform facts and ideas into an expression that "display[s] the stamp of the author's originality." Harper & Row, 471 U.S. at 547. If the similarity between two works rests solely on a shared underlying idea, rather than the particular way in which that idea has been portrayed, there is no "substantial similarity."

Examples help illustrate the principle. In Williams, the author of the book series *Dinosaur World* brought suit against the author of *Jurassic Park* for copyright infringement. 84 F.3d at 582. *Jurassic Park* and *Dinosaur World* expressed many similar ideas. Both were works about a dinosaur zoo. Id. at 589. Both stories centered a small group of individuals, including a knowledgeable adult guide and young dinosaur enthusiasts. Id. Both depicted harrowing encounters with carnivorous dinosaurs from which the human characters escaped, via helicopter, "through the combined wit of the children and adults." Id. However, "those scenes that appear[ed] similar in their abstract description prove[d] to be quite dissimilar once examined in any detail." Id. at 590. Similarly, there were "many differences" in the characters "beyond the superficial similarities" such as their age, gender, and the fact that the children were siblings. Id. at 589. Moreover, the characters in *Dinosaur World* were only weakly developed, and "the less developed the characters, the less they can be copyrighted." Id., quoting Nichols v. Universal Pictures Corporation, 45 F.2d 119, 121 (2d Cir. 1930). Because *Dinosaur World* and *Jurassic Park* were similar only with respect to the general ideas they depicted and not the way they expressed those ideas, there was no substantial similarity as a matter of law.

5

Similarly, in Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357 (2d Cir. 1983), the manufacturer of "Masters of the Universe" action figures sought an injunction against the makers of "Warlords" action figures. Id. at 359. The torsos of the two action figures were very similar, sharing "overdeveloped musculature," "legs proportionately shorter" than average, similar shape, and nearly identical size. Id. at 360. Additionally, both toys were "posed" in a "similar crouching position." Id. The court determined that the similarities were not an unlawful appropriation of artistic expression because the similarities, while significant, were "attribut[able] to the fact that both [were] artist[s'] rendering[s] of the same unprotectable idea – a superhuman muscleman crouching in . . . a traditional fighting pose." Id. The court pointed out that "[t]he rendering of such an idea is not protectable; only the particularized expression of that idea" is. Id. The Warlord figures had distinct "names, heads, feet, hands, and clothing," as well as "pectoral, abdominal, and other musculature that differ[ed] in minor though significant detail" from that of the Masters of the Universe figures. Id. Thus, the way the Warlord figures expressed the idea of a superhuman muscleman differed from the way that idea was expressed by the Masters of the Universe figures, and there was no substantial similarity between the two figures. Id.

Elements subject to the doctrine of *scènes à faire* are also not protectable. *Scènes à faire* are "elements that follow naturally from a work's theme rather than from an author's creativity." MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 194 (2d Cir. 2004). The doctrine holds that "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are not protectable. Alexander v. Haley, 460 F. Supp. 40, 45 (S.D.N.Y. 1978). For example, attempted escapes by slaves and the chasing of

6

fugitives through the woods with dogs are standard in a story about the slave trade and, therefore, unprotectable. Id. Similarly, the presence of "drunks, prostitutes, vermin and derelict cars" as well as "[f]oot chases . . . and . . . the familiar figure of the Irish Cop" are unprotectable because they appear "in any realistic work about . . . policemen in the South Bronx." Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir. 1986). Likewise, "uniformed workers" managing a dinosaur zoo's exhibits are unprotectable because they "flow from the uncopyrightable concept" of a dinosaur zoo. Williams, 84 F.3d at 589.

### B. Application

After reading the script for *Bronx House*, viewing the motion picture *Life*, and thoroughly analyzing plaintiff's supporting materials, it is clear that no substantial similarity exists between the two works. Any similarity between the two works exists only at the most general level, in that *Life* and *Bronx House* are both set in prisons and deal with the issue of wrongful incarceration. But these are similarities only in the ideas the works seek to represent, and thus are not protectable elements of artistic expression. What little resemblance there is between *Bronx House* and *Life* is attributable solely to unprotectable elements.

There is no substantial similarity in the total concept and feel, theme, setting, or plot of *Bronx House* and *Life*. Hudson summarizes *Bronx House* as "the story of a New York City Comptroller who is accused of stealing $5,000,000.00 from the city and is jailed at the Bronx House of Detention where two rival gangs [try] to kill him." Gregory L. Hudson, *Bronx House* 3 (1994). The story is set in the 1990s, unfolds over the course of approximately one week, and seeks to portray the violence of the modern prison. The plot is driven by the attempt of the main character, Reggie, to avoid being killed by the rival gangs until his lawyer can get him released.

7

There is only superficial interaction among the characters, who are little more than two-dimensional stereotypes (violent gang member, overbearing prison guard, tough cop, etc.).

*Life*, on the other hand, takes place in a prison Mississippi and tells the story, starting in the 1930s, of two men who are wrongfully incarcerated for over sixty years. It is a dramatic comedy that portrays the psychological effect of wrongful incarceration and the development of friendships over many decades of close contact. In contrast to *Bronx House*, character interaction is central to the plot, the story takes place over many years rather than one week, and humor (an element completely lacking from *Bronx House*) plays a major role in humanizing the characters and easing tension. In their major expressive elements, there is no similarity between the two works.

Hudson's claims of similarities among specific elements in the two works are also meritless. Hudson's first specific claim is that the "boundary lines" in *Bronx House* are substantially similar to the "gun line" in *Life*. (P. Mem. 13.) The "boundary lines" in *Bronx House* are a pair of three inch wide lines drawn on the cell floor, demarcating the territory of rival gangs living within the prison. *Bronx House* 16. The "gun line" in *Life* is a wide path surrounding the entire prison complex, separating inmates from the outside world. *Life*, scene 15 (Universal Pictures 1999). Prisoners who attempt to cross it are shot. Id., scene 8. The boundary line in *Bronx House* and the gun line in *Life* are expressions of a broadly similar idea – a line used to separate people – but they are different in appearance and in the specific function each plays in each story. Accordingly, there was no appropriation of a protectable element from *Bronx House*.

Hudson next asserts that the "inspections line" in *Bronx House* is substantially similar to the "inspection line" in *Life*. (P. Mem. 14.) The cell in *Bronx House* has an inspections line painted on the floor. *Bronx House* 23. Throughout the play, inmates are directed to stand on the line while they are either searched or reprimanded by a corrections officer. Id. This is done in order to build "drama, tension, and suspense" as the audience anticipates the inevitable violent outburst. (P. Mem. 14.) In *Life*, prisoners are also instructed to line up from time to time. However, unlike *Bronx House*, there is no painted line on the cell floor – or anywhere else – upon which prisoners stand for inspection. Instead, in three scenes, prisoners are instructed to form a line at various spots outside their bunk house. See, e.g., *Life*, scene 8. Moreover, the inspections play a different role in *Life* than they do in *Bronx House*, advancing the plot through monologues by a corrections officer with tension broken by humor. See, e.g., id., scene 13. The inspections in *Life* and *Bronx House* share only the underlying idea of an inspection of prisoners, which is not protectable. Moreover, the idea of prisoners lining up for inspection is an element that flows naturally from the setting of a prison drama, and is thus an unprotectable *scène à faire*. See Alexander, 460 F. Supp. at 45.

The third alleged similarity is the style and arrangement of the prisoners' bunk beds. (P. Mem. 14.) In both works, the prisoners sleep on bunk beds arranged against the wall of their sleeping quarters (a jail cell in *Bronx House* and a bunk house in *Life*). The *Bronx House* script describes this arrangement as "typical" for a "[j]ail cell." *Bronx House* 16. Since depicting something in a "typical" way requires no creativity by the author, Hudson effectively concedes that there is no artistic expression in the arrangement of the bunk beds in *Bronx House*, and

9

instead the arrangement flows naturally from the setting of a prison drama, unprotectable as a *scène à faire* .

Hudson next asserts that the similarity between the phrase "Bronx House," which is short for the Bronx House of Detention, and "bunk house," which is how characters refer to the prisoners' sleeping quarters in *Life*, is a substantial similarity between the two works. (P. Mem. 15.) This claim is meritless. The Bronx House of Detention is an actual prison facility; Hudson has no protectable interest in its name or the fact of its existence. "Bunk house" is a common generic description of a dormitory or communal living area for workers or prisoners. See Oxford English Dictionary (2d ed. 1989) (under the entry for "bunk," defining "bunk-house" as "a house where workmen, etc., are lodged"). Not only is it a completely different concept from the proper name "Bronx House," but it is a generic and uncreative description of a type of facility common to prison – and other – settings. Hudson provides no authority, and the Court has found none, supporting the proposition that the use of a phrase can be an unlawful appropriation of a distinct, if phonetically similar, phrase.

Hudson's remaining assertions rest on similarities between three pairs of characters: (1) Sixty Nine from *Bronx House* and Biscuit from *Life*; (2) Officer Hurt from *Bronx House* and Officer Dillard from *Life*; and (3) Reggie from *Bronx House* and Claude from *Life*. (P. Mem. 15-17.) The characters in *Bronx House* are essentially undeveloped stereotypes, such that there is little expression in them that is protectable. See Nichols, 45 F.2d at 121. They are similar to the characters in *Life* only in regard to unprotectable ideas and facts, not creative expression.

Hudson alleges that both Sixty Nine and Biscuit are "horny, sex[-]seeking, over[-]the[-]top gay characters." (P. Mem. 16.) But Hudson cannot claim creative ownership of the idea of a

10

horny, sex-seeking, over-the-top, gay character.  Moreover, the portrayal of Biscuit in *Life* is about more than his sexual appetites.  In the film's emotional climax, Biscuit, unable to cope with the prospect of his impending release, commits suicide, illustrating one of the movie's central themes about the effect of long-term incarceration on an inmate's mental health.  See *Life*, scene 14.  Sixty Nine plays no similar role in *Bronx House*.  Indeed, the end of *Bronx House* reveals that Sixty Nine is not in fact a gay man at all, but rather a female undercover agent gathering intelligence on prison gangs.  The nature and function of the characters are thus completely different.  The only similarities between Sixty Nine and Biscuit are their race, their apparent sexual orientation, and the fact that they are incarcerated.  There is no similarity in protectable expression.

Hudson's claim of similarity between Officer Hurt and Officer Dillard is also meritless.  Both characters are prison guards who carry weapons, speak with authority, and interact with the typical mannerisms one would associate with a domineering corrections officer.  But Hudson cannot claim ownership over the idea of a tough prison guard.  Moreover, in the important details, Officer Hurt and Officer Dillard share nothing in common.  Officer Hurt is a woman, and as she struggles to maintain order within the prison she uses her gender as a justification for mistreating prisoners.  See, e.g., *Bronx House* 33 ("If I show the least sign of weakness in here, I'm a dead woman.  Women don't get the same respect as men do in here. . . . If I act friendly towards you, they take that as a weakness.").  Officer Dillard, in *Life*, is male, and while we see little of his character, it is clear that maintaining order is not a challenge for him.  Similarities such as the fact that Officer Hurt and Officer Dillard both carry weapons, wear uniforms, and

11

give orders, represent the inevitable rendering of the same unprotectable idea. See Mattel, 724 F.2d at 360.

Finally, there is no substantial similarity between Reggie and Claude. Both are young, African-American men. But the idea of a young, incarcerated African-American male is not a protectable story element. And the way in which this idea about the characters is expressed is dramatically different. Reggie, the protagonist in *Bronx House*, is a successful government employee who has risen to the rank of New York City Comptroller, *Bronx House* 3, while Claude is a rum-runner with plans to become a bank teller, *Life*, scenes 3-4. Reggie is able to use his friends in government and the police force to secure his safety while in prison and facilitate his quick release, while Claude has no outside support and has to spend more than sixty years behind bars.

A detailed comparison of *Bronx House* and *Life* makes clear that there is no substantial similarity between the two works. The common elements are: (1) they are set inside prisons; (2) some of the characters are African-American men; (3) the characters sleep on bunk beds arranged in a typical fashion; (4) some of the prisoners appear to be homosexual; (5) the main characters are wrongly incarcerated; (6) there are overbearing prison guards; (7) there are lines to demarcate boundaries; and (8) prisoners line up for inspections. These elements are unprotectable facts and ideas and/or *scènes à faire*, and a close inspection of the elements shows no similarity in how these ideas are expressed. Since *Bronx House* and *Life* share no protectable elements, there is no substantial similarity between the two works as a matter of law, and therefore no unlawful appropriation of Hudson's artistic expression.

## III. Breach of Implied Contract

Hudson claims that defendants breached an implied contract to compensate him for any use of *Bronx House*. An implied contract is a contract in which a party's promise of performance is "inferred wholly or partly from conduct" rather than from an express oral or written agreement. Maas v. Cornell University, 94 N.Y.2d 87, 93 (1999), quoting Restatement (Second) of Contracts § 4 (1981). For the reasons stated above, no reasonable jury could conclude that defendants used any of Hudson's creative expression, since there is no similarity between the expressive elements of *Bronx House* and *Life*. Accordingly, there can be no claim for breaching an agreement to compensate Hudson for the use of such elements. However, there remains the possibility that defendants agreed to compensate Hudson for the use of non-expressive ideas contained in *Bronx House*, even though such ideas are not protectable by copyright.

As with all contracts, proof of an implied contract requires proof of consideration. Maas, 94 N.Y.2d at 94. The sharing of an idea is sufficient consideration to support a contract claim where "the idea at issue had value to the defendant at the time the parties concluded their . . . agreement." Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 374 (2d Cir. 2000), citing Apfel v. Prudential-Bache Securities, Inc., 81 N.Y.2d 470, 476 (1993). "[N]ovelty to the buyer," not novelty to the world generally, determines whether an idea has value to a defendant. Nadel, 208 F.3d at 377. However, "an idea may be so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea, and such knowledge is therefore imputed to the buyer." Id. at 378. In such cases, a court may conclude, as a matter of

law, that the idea lacks the novelty to the buyer necessary to support a contract claim. Id. at 378-79.

Such is the case here. There is certainly nothing novel in the general idea of a story about a person wrongfully incarcerated. Nor is there anything novel in the elements of the prison setting, such as the bunk beds arranged in a "typical" fashion, lines demarcating boundaries within or around the prison, or the fact that prisoners are required to stand for inspection from time to time. For the same reason that such elements are *scènes à faire* – that they are "indispensable, or at least standard, in the treatment of a given topic," Alexander, 460 F. Supp. at 45 – they are also not novel. Nor is there anything novel in the idea of prisoner who is African-American or homosexual, or of a prison guard who is overbearing. In creating a prison movie, a screenwriter might or might not choose to include characters with such characteristics, but the possibility would almost certainly occur to him or her. Such "ideas" are "so unoriginal [and] lacking in novelty that [their] obviousness bespeaks widespread and public knowledge." Nadel, 208 F.3d at 378.[2] Accordingly, they could not have been consideration in an implied contract between Hudson and defendants, and Hudson's breach of implied contract claim is without merit.

## IV. Lanham Act

Finally, Hudson has no claim for unfair competition under the Lanham Act. The Supreme Court has ruled that the Lanham Act, which prohibits misrepresenting the origin of the goods one sells, was designed to protect only "tangible goods" and not "any idea, concept, or

---

[2] The point here is not that Hudson's play is unoriginal. The Court expresses no opinion about the literary quality of his work. Rather, the point is that the elements or ideas that defendants allegedly appropriated are the most unoriginal and generic aspects of Hudson's work, such that no reasonable jury could conclude that defendants or anyone else would have contracted to compensate him for their use.

communication embodied in [such goods]." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 37 (2003). The Court "caution[ed] against misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright." Id. at 34, citing TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29 (2001).

Since Dastar, Lanham Act claims arising from the alleged copying of creative work have been "clearly foreclosed." Contractual Obligation Prods., LLC v. AMC Networks, Inc., 546 F. Supp. 2d 120, 129 (S.D.N.Y. 2008). When a plaintiff's "unfair competition claims are based on the very acts of producing . . . allegedly infringing works that form the factual underpinnings of its copyright claims," the unfair competition claims under the Lanham Act "fail as a matter of law." Freeplay Music, Inc. v. Cox Radio, Inc., 409 F. Supp. 2d 259, 263-64 (S.D.N.Y. 2005). Because the factual underpinnings of Hudson's Lanham Act claim are identical to those of his copyright claim, the Lanham Act claim must fail.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiff's complaint is dismissed in its entirety.

SO ORDERED.

Dated: New York, New York
October 23, 2008

/s/ Gerard E. Lynch
GERARD E. LYNCH
United States District Judge

15